J. L. Lewis v. Commissioner.
Lewis v. Commissioner
Docket No. 37335.
United States Tax Court
T.C. Memo 1955-93; 1955 Tax Ct. Memo LEXIS 245; 14 T.C.M. (CCH) 319; T.C.M. (RIA) 55093; April 19, 1955
*245 Petitioner, the proprietor of a smalltown general store and other enterprises, hired, in 1907, an employee to whom he entrusted the management of the business, including the maintenance of all of petitioner's books and records, until the manager's death in 1950. Petitioner had complete confidence in him and personally took no part in the keeping of the books and records or in the preparation of the income tax returns. Although most of petitioner's income was initially listed in one of the various books of original entry, the lack of proper control accounts caused failure to report substantial amounts in petitioner's income tax returns. Held, on the facts, none of the returns were fraudulent and no part of the deficiencies was due to fraud with intent to evade tax. Held, further, the deficiencies for 1940 and for the years 1942 through 1944 are barred by the statute of limitations. Held, further, the deficiency for 1946 is not barred by the statute of limitations, since petitioner omitted from gross income in that year more than 25 per cent of the gross income stated in the return. Held, further, the deficiencies for the years 1945 through 1949 are increased on the basis of the *246 increased income for those years conceded by petitioner. Held, further, the deficiencies for each of the years 1945 through 1949 were due at least in part to negligence. Richard E. Thigpen, Esq., 112 South Tryon Street, Charlotte, N.C., for the petitioner. Ralph V. Bradbury, Jr., Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in the income taxes of petitioner and 50 per cent fraud penalties under section 293(b) of the Internal Revenue Code of 1939, as follows: Taxable
Amount of Deficiencies
Year
Income Tax
50% Penalty
1940
$ 4,578.43
$ 2,289.22
1942
22,046.19
11,023.10
1943
7,261.51 *
3,630.76
1944
21,089.88
10,544.94
1945
26,161.89
13,080.95
1946
30,407.87
15,203.94
1947
5,481.33
2,740.67
1948
10,761.07
5,380.54
1949
10,936.49
5,468.25
Total
$138,724.66
$69,362.37
By amendment to his answer, respondent makes claim in the alternative for the five per cent negligence penalty provided by section 293(a) to the 50 per cent fraud penalty, and increased deficiencies and penalties for the years 1944 through 1949 based on the increased income *247 conceded by petitioner to have been received in those years. In a further amendment to his answer, respondent affirmatively claims, in the alternative, an increase of $13,831.30 in the deficiency for 1943, with an appropriate increase in the fraud penalty for that year based on the provisions of section six of the Current Tax Payment Act of 1943. The issues for decision are as follows: 1. Whether any parts of the deficiencies for the years 1940 and 1942 through 1949 were due to fraud with intent to evade tax. 2. Whether the deficiencies for any of those years are barred by the statute of limitations. 3. The determination of petitioner's taxable income for the years not so barred. 4. Whether any parts of the deficiencies for any of the years not so barred were due to negligence. The stipulated facts are so found and incorporated herein by this reference. Findings of Fact Petitioner, a resident of Tabor City, North Carolina, was 75 years of age at the time of the trial. His individual income tax returns for the years before us were timely filed with the collector of internal revenue for the district of North Carolina and showed net income as follows: 1940
$ 1,521.26
1942
10,547.71
1943
18,070.40
1944
14,930.10
1945
11,300.61
1946
5,429.58
1947
3,622.16
1948
5,544.02
1949
5,587.71
*248 Petitioner was born in Marion County, South Carolina, and attended the public schools there. He spent a year and a half studying agriculture at Clemson College in 1897 and 1898, after which time he dropped out for lack of funds. From that time until 1906, he was engaged in farming and in the operation of a small commissary in connection therewith. In 1906, petitioner moved to Tabor City, North Carolina, where he started the Enterprise Grocery Company, which business he operated for about five years, after which he discontinued it and began operating the Tabor Hardware Company, a sole proprietorship. Petitioner retained a bank account in the name of the Enterprise Grocery Company after the termination of that business, using it as a personal account. In 1907, petitioner started selling coffins and caskets, which business developed into the Lewis Funeral Home operated by petitioner in the building adjoining the Tabor Hardware Company. During the years in question, petitioner also owned a number of farms in the Tabor City area. He customarily supplied the necessary fertilizer to the tenant farmers who did the work and divided the profits with petitioner. Petitioner also dealt *249 in fertilizer sales to farmers other than his tenants. Petitioner also had an investment of $6,000 in the stock of the Lewis-Peay Motor Company during the taxable years. He also owned substantial amounts of government securities and government bonds. During the years in question, petitioner's principal source of income was the hardware store which was in the nature of a general store selling such diverse items as groceries, clothing, drygoods, hardware, building materials, plumbing supplies, paints, feeds, seeds, fertilizer and crop insurance. Petitioner ordinarily spent one or two hours at his place of business in the morning and another hour or two there in the afternoon. On his doctor's advice, he usually slept two to three hours in the middle of the day. When the weather permitted, he visited one of his farms. Petitioner employed as manager and bookkeeper of the Tabor Hardware Company one R. T. Bruton who had started to work for him as early as 1907 or 1908. Bruton set up and maintained all of petitioner's books, with some assistance in the later years, until his death in 1950. Bruton did virtually all the buying for the business and prepared petitioner's income tax returns *250 for all the years before us. Although he had little or no bookkeeping experience when he first came to work for petitioner, he subsequently completed some 40 lessons in accounting from a correspondence school, a fact known to petitioner. Bruton prepared financial statements for petitioner in each of the taxable years for credit purposes which purported to show net worth. Copies of such statements were sent to banks and other interested parties. In addition to income from the hardware company, the funeral home and the farms, petitioner received income from rental property, bonds, stocks, loans and the Lewis-Peay Motor Company during the years in controversy. The petitioner had absolute confidence in Bruton and assumed that he was keeping the books and records properly and that Bruton was properly reporting his income from all sources. He never questioned Bruton as to the correctness of the returns and frequently signed papers prepared by him without examining them. In December 1949, the respondent's agents started an investigation of the petitioner's income tax returns, receiving from him full cooperation and free access to his books and records. The agents made their determination *251 by the increase in net worth method, incorporating in their determination many figures or amounts taken from the books and records of the petitioner. Under the net worth method, the respondent determined that the petitioner's net income was as follows: Year
Net Income
1940
$27,048.93
1942
48,951.46
1943
30,201.18
1944
47,556.97
1945
52,803.73
1946
59,305.92
1947
19,201.28
1948
31,851.88
1949
32,188.90
In the ordinary course of business, a customer of the Tabor Hardware Company making a purchase on credit would have a ticket made out in his name showing each article and the amount purchased. These charge tickets were copied into a charge sales journal and the total amount was entered upon the individual customer's account in an accounts receivable ledger. If the sale was for cash, the amount was rung up on the cash register and at the end of each day the amount of cash sales as shown by the cash register tape was entered in a cash book. Collections on accounts receivable from customers were also entered in the cash book. Money paid out for expenses or deposited in the bank was recorded in the cash book. Sales were classified for purposes of the North *252 Carolina sales tax as taxable and nontaxable and entered upon the columnar journal on which expenses also were entered. Throughout the years under consideration, books and records were maintained which petitioner believed reflected all of his business transactions. The petitioner's books and records consisted of journals on which were entered charge sales, journals on which were entered fertilizer sales, cash books upon which were entered daily cash receipts and disbursements, columnar journals on which sales were summarized and classified and expenses recorded, ledgers for accounts receivable for store accounts, fertilizer accounts and farm accounts, inventory books in which the annual physical inventory was recorded, and in some years a list of accounts receivable classed as good and bad, books in which were pasted invoices from suppliers and creditors for merchandise purchased, a rent book showing the rent account of each tenant, a record of stocks and bonds showing date and cost of acquisition, dividends, interest and sales, a book of financial statements showing assets and liabilities of the petitioner from which Bruton prepared financial statements filed with creditors and *253 banks, bank statements and cancelled checks. Because of the lack of adequate control accounts in the bookkeeping system employed by Bruton over a period of more than 40 years, various receipts entered on the books of original entry were never reflected in the income accounts. Following the investigation by the respondent's agents, the petitioner employed a certified public accountant to audit his books and records and to determine his income. The audit was made in accordance with established auditing practices and from the books and records the accountant determined petitioner's taxable net income for the years in question to be as follows: Year
Net Income
1942 *
$31,471.22
1943
29,268.70
1944
53,464.82
1945
56,927.75
1946
66,220.72
1947
36,229.96
1948
41,223.03
1949
34,359.09
The statutory deficiency notice was mailed to the petitioner on August 10, 1951. In his income tax return for 1946, petitioner showed receipt of $286,385.05 from sales by the Tabor Hardware Company, rents, farms and dividends. Petitioner's income *254 tax return for 1946 understated sales of the Tabor Hardware Company by $28,072.20. The gross income disclosed by the 1946 return amounted to $29,111.03. Petitioner omitted from his gross income for 1946 an amount properly includible therein in excess of 25 per cent of the gross income stated in the return. Opinion ARUNDELL, Judge: The chief issue in this case is the applicability of the fraud penalties prescribed by section 293(b) of the Internal Revenue Code of 1939. At the conclusion of the taking of testimony in this cause, the Court expressed its opinion that the respondent had not proven by clear and convincing evidence that any part of the deficiencies was due to fraud with intent to evade the tax. The record has been painstakingly reviewed and the briefs studied and it is our opinion that the view expressed from the bench at the conclusion of the trial should be adhered to. This is not to say that there were not errors in the returns for there were many, and we have no difficulty in reaching the conclusion that petitioner was grossly negligent. The books had been kept since 1907 by one Bruton who during the taxable years was also the manager of this general store. *255 When the revenue agents arrived at the store, they saw petitioner and also Bruton and the books and records were made available to them. The books seem to have been kept in more or less the same manner during the entire period the business was operated and there was the usual variety of accounts but not the control accounts which would enable one to see quickly the results of the business operations. The revenue agents were evidently baffled by the time-consuming labor that would be required to reconcile the books and took refuge in the net worth method of determining income, and it was by this method that the deficiencies were determined. This method, when applied to the determination of income flowing from the operations of a legitimate business while pointing to the dollar increase in wealth, frequently leaves one at a loss as to how the understatement occurred. It was a firm of certified public accountants employed by petitioner after the respondent's determination was made that pointed out the nature of the understatements. There was a marked discrepancy between the total net income reported on the returns and that ferreted out by the accountants, but this condition appears *256 to have arisen from a variety of errors resulting from the way the books were kept and nothing pointed to any plan to understate gross income or increase deductions. While some minor isolated items could not be found in the accounts, certainly the major items incident to the conduct of petitioner's business appear to be on the books of account, but absent the control accounts that we have already spoken of, numerous errors were made in transferring the book figures to the returns. Unfortunately the one person who could explain matters was dead at the time of trial although he was living and available to the revenue agents at the time of their investigation. Petitioner placed implicit reliance in Bruton, and certainly there is nothing in this record to indicate that Bruton deliberately made false returns or that petitioner interfered in any manner in the keeping of the books or the making of the returns. Perhaps it could be said that petitioner should be punished for not using more care in the selection of a competent person to keep his books and make his returns, but sometimes there is no accounting for the confidence one has in an old and trusted employee who has served him well *257 and faithfully. One can hardly characterize as deliberate fraud petitioner's failure to replace Bruton by a competent certified public accountant. Respondent argues that petitioner must have known that income was grossly understated in the returns. He points out that petitioner signed the returns, that there was a constant and substantial increase in petitioner's net worth over the taxable years, that petitioner's bookkeeper prepared financial statements for each of the years involved showing large increases in petitioner's net worth and that petitioner made gifts to relatives disproportionate to the income reported. Respondent cites numerous cases in which, on facts resembling those in the instant case in varying degrees, fraud penalties have been imposed. In each of those cases, however, the Court reached a conclusion of fact that the taxpayer had specifically intended to defraud the Government. To sustain a finding of fraud, the respondent must show by clear and convincing evidence fraud by calculated tax evasion. E. S. Iley, 19 T.C. 631, 635. This he has not done. After studying the demeanor of the petitioner on the stand and his testimony in light of the entire *258 record, we are left with the distinct impression that he had no such intention. During much of this period he was required by his doctors to take long rest periods each day and at the time of the trial he was a man 75 years of age. That petitioner was appallingly negligent in his failure to discover Bruton's inadequacy goes without saying and we surely need cite no authority for the imposition of the five per cent negligence penalty in each of the years remaining open as indicated at the close of the hearing. However, no degree of negligence will, in itself, support a fraud penalty. E. S. Iley, supra; William W. Kellett, 5 T.C. 608, 618. We must next turn to the question of the application of the statutes of limitations. Respondent concedes that, in the absence of fraud, the years 1940, 1942, 1943 and 1944 are closed. The deficiencies for those years, therefore, must be set aside. The year 1945 remains open by reason of valid waivers of the statute of limitations executed by petitioner. Petitioner concedes that 1947, 1948 and 1949 remain open even in the absence of fraud. As to the year 1946, respondent relies on section 275(c) of the Internal Revenue *259 Code of 1939 which extends the period of limitation to five years where the taxpayer has omitted from gross income an amount properly includible therein in excess of 25 per cent of the gross income reported. We think there is no question of the correctness of respondent's position. Petitioner concedes that the 1946 return understated gross income by more than 25 per cent but contends that the understatement was not an "omission" from gross income within the meaning of section 275(c). Petitioner's contentions on this point are based on the decision of the Court of Appeals for the Third Circuit in Uptegrove Lumber Co. v. Commissioner, 204 Fed. (2d) 570, reversing a decision of this Court. The Court of Appeals there held the five-year statute was applicable only where the taxpayer has failed to include some receipt or accrual in computing gross income and not where the understatement of gross income resulted from an overstatement of cost of goods sold. Without endorsing in any way the view of the Court of Appeals, we note that petitioner's position is untenable even under that theory. The report prepared by petitioner's auditor discloses that sales of the Tabor Hardware *260 Co. for 1946 exceeded those shown on the return by $28,072.20. Not only does this omission from receipts exceed 25 per cent of the gross income as shown by the return, it would also meet the requirements of section 275(c) if we were to recompute gross income reported on the basis of the lesser cost of goods sold shown by petitioner's audit report. It follows that for the years 1945 through 1949, deficiencies must be redetermined on the basis of the net income figures for those years as shown by the report of petitioner's auditor and that the negligence penalty is applicable to those deficiencies. The fraud penalties for all of the years before us must be set aside. Although both parties have covered in their briefs the question of the propriety of the respondent's use of the net worth method and his computations thereunder, we think no useful purpose would be served by out discussing it. For the years 1944 through 1949, petitioner concedes that his income exceeded that shown by the net worth computation. And even though we were to assume the correctness of respondent's computations for 1940, 1942 and 1943, we think it would make absolutely no difference in our decision on the fraud *261 question and we have found those years to be closed by the statute of limitations. Therefore, the questions arising from use of the net worth method are academic and need not be pursued further. Decision will be entered under Rule 50. Footnotes
*. The audit report did not include the year 1940 because of the unavailability of records for that particular year.↩